# EXHIBIT

# A

EFiled: Oct 12 2010 3:26PM
Transaction ID 33759027
Case No. N10C-10-099 PLA

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| THE ST. JOE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| TRANSOCEAN OFFSHORE DEEPWATER | § | CASE NO. N10C-10-099 PLA |
| DRILLING, INC.; TRANSOCEAN | § | |
| HOLDINGS LLC; TRANSOCEAN | § | JURY OF 12 DEMANDED |
| DEEPWATER, INC.; and TRITON ASSET | § | |
| LEASING GmbH, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## COMPLAINT AND JURY DEMAND

The St. Joe Company ("St. Joe" or "Plaintiff") files this Complaint and Jury Demand against defendants Transocean Offshore Deepwater Drilling, Inc.; Transocean Holdings LLC; Transocean Deepwater, Inc.; and Triton Asset Leasing GmbH (collectively "Transocean" or "Defendants"), upon personal knowledge as to itself and its own actions, and on information and belief as to all other matters, as follows:

### I.

### PRELIMINARY STATEMENT

**A.** **Transocean's Role In The *Deepwater Horizon* Disaster**

1. The oil spill which resulted from the destruction of the *Deepwater Horizon* drilling rig is the most horrific environmental disaster in our nation's history. Millions of livelihoods, tens of billions of dollars, and the economic vitality of the Gulf Coast have been sacrificed by the willful disregard for rights and safety of others by a handful of wrongdoers. Among those primarily responsible for this disaster is Transocean, the world's largest offshore

drilling contractor and the owner of the *Deepwater Horizon*. At the time of the incident, Transocean, the lessor of the rig to BP Exploration & Production, Inc. ("BP"), remained responsible for the operation and maintenance of the rig, its equipment, as well as day-to-day drilling activities. Therefore, Transocean was responsible for performing or authorizing performance of many of the activities necessary to maintain well control at the drilling site.

2.      Unfortunately, Transocean utterly failed to live up to its responsibilities. In the months preceding the explosion at the *Deepwater Horizon*, Transocean failed to conduct routine inspections mandated by regulations on over 300 pieces of equipment on the *Deepwater Horizon*. Indeed, at the time of the disaster, the blowout preventer – the rig's last line of defense against the unchecked discharge of oil and gas from a well in the event of an emergency – was compromised due to Transocean's grossly inadequate maintenance of this mandatory safety equipment. The safety audit also found hundreds of mechanical problems with the rig, some of which were so severe that Transocean was ordered to shut down drilling operations on the *Deepwater Horizon*.

3.      Predictably, the scores of reckless choices made by Transocean led to the explosion which occurred on April 20, 2010. In the hours before the destruction of the *Deepwater Horizon*, Transocean acquiesced in a series of decisions by BP, which were contrary to industry standards, regulatory mandates, and good sense. For example, Transocean stood by while the drilling fluids contractor at the well displaced heavy drilling fluids in the well with lighter seawater *before* the cementing contractor, Halliburton Energy Services, Inc. ("Halliburton) placed the final cement plug meant to seal the well. Transocean went along with this inherently risky plan even though: (i) it knew that the plan created a dangerous prospect that oil and gas might escape up the well; (ii) the well had a history of severe gas problems; (iii) there

-2-

was no confirmation that the well had been properly sealed at the bottom with cement; and (iv) it had been determined that a similar procedure had been a major contributing factor to a blowout that had occurred only four months earlier at an exploratory well being drilled by Transocean in the North Sea. Clearly, Transocean managed well completion activities in a grossly negligent manner by, among other things, failing to ensure adequate well pressure tests were conducted, configuring rig equipment in a fashion that made it impossible for the *Deepwater Horizon*'s crew to monitor the drilling fluid being removed for indicators of gas influx, and ignoring multiple red flags that a blowout was imminent.

4. At approximately 9:45 p.m. on April 20, 2010, the cement plug that was intended to seal the bottom of the well failed. Without the downward pressure exerted by a sufficient volume of drilling fluids to stop it, methane gas raced unimpeded up the drilling column. The gas spread rapidly onto the *Deepwater Horizon*'s platform and ignited, killing 11 workers and injuring 17 others. The rig's blowout preventer and other emergency systems – which Transocean had failed to maintain in good working order – all failed, permitting gas and oil to flow unchecked from the well, and forcing the remaining crewmembers to abandon the rig (the "Incident").

5. Over the next 36 hours, the 32,000-ton *Deepwater Horizon* sank to the bottom of the Gulf of Mexico ("Gulf"). As it descended to the seafloor, the rig pulled the drilling apparatus down with it, bending and breaking the riser pipe that connected the rig to the well before finally tearing away from it completely. Thereafter, the well was left uncapped, allowing as many as 100,000 barrels of crude oil per day to spew unchecked into the waters of the Gulf – a condition that lasted for almost three months.

6.    These facts render hollow the statement of core values by Transocean on its website, which claims that "[p]ersonal safety and employee health is our greatest responsibility, followed by the protection of our environment and company property." Hollow, too, is Transocean's alleged commitment to use "best operational practices" to maintain well control at its drilling sites and to impose upon its employees the "obligation and the responsibility not to participate in an unsafe act and . . . to interrupt any operation to prevent an unsafe act or unsafe condition from causing an incident." Having proclaimed the standard of care that should have guided its conduct, it is incredible that Transocean so completely failed to meet its own standards, and willingly facilitated BP's determination to put saving money above the safety of those working on the *Deepwater Horizon*, the residents of the Gulf, and the environment.

## B.    <u>The Damage To St. Joe</u>

7.    St. Joe — the owner and developer of approximately 577,000 acres of property along Florida's Northwest coast - is among those directly damaged by Transocean's failure to exercise due care. As investors developed a better understanding of the full impact of the oil spill, St. Joe's stock price tumbled over forty percent in the weeks following the explosion. Since then, as the magnitude of the environmental damage and economic devastation in the Gulf has become apparent, St. Joe's stock has remained depressed. Oil and other harmful pollutants discharged from the uncapped well have fouled the Gulf's waters, damaged marine life and brought immediate and long-term economic harm to businesses operating in Florida. St. Joe's vision for the development of Northwest Florida has been directly damaged as a result of Transocean's actions. As scientists grope to comprehend the full scope of the environmental devastation, it is difficult to foresee how long it will take for the Gulf to recover its former vitality. George Crozier, Executive Director of the Dauphin Island Sea Lab at the State of

-4-

Alabama Marine Science Institution, predicts that the oil spill "will cause long-term economic loss for years, because there's no way to clean it."

8.      As a real estate development company focused on Northwest Florida, the intrinsic value and financial success of St. Joe are inextricably tied to the health and well-being of the Gulf.  The environmental harm to the Gulf triggered by this disaster, as well as the resulting economic and financial losses to Gulf Coast residents and businesses, will have detrimental long-term consequences to St. Joe.

**C.      Transocean Is Responsible For The Billions Of Dollars Of Damages It Caused.**

9.      While the full extent of the environmental and economic harm caused by the *Deepwater Horizon* disaster cannot be calculated at this time, Transocean has shamelessly attempted to deflect its own responsibility for the catastrophe and wrongly asserted that its financial responsibility for the resulting harm is limited to a mere fraction of the expected total damages.  To the contrary, Transocean is liable for the grossly negligent, reckless, and wanton way in which it operated and maintained the *Deepwater Horizon*, as well as the inherently dangerous manner in which it conducted drilling activities at the well.

10.      The *Deepwater Horizon* disaster, and the resulting environmental and economic damage, stemmed as much from Transocean's indifference to known risks, gross negligence, and greedy pursuit of profits over safety as it did from that of BP and others.  Transocean could have and *should have* prevented this catastrophic event.  Against any application of existing law, Transocean is *jointly and severally liable* for all of the actual and consequential damages that St. Joe has suffered, and will continue to suffer, because of this readily preventable disaster.

#13293167 v1

## II.

## PARTIES

**A.    Plaintiff**

11.    The St. Joe Company, a Florida corporation, is a residential and commercial real estate developer with its principal place of business in WaterSound, Florida.

**B.    Defendants**

12.    Defendant Transocean Offshore Deepwater Drilling, Inc. is organized under the laws of Delaware, with its principal place of business in Houston, Texas. It was the employer of the land-based crew working with the *Deepwater Horizon* drilling rig on behalf of Transocean, and has represented that it is an owner, managing owner, owner *pro hac vice*, and/or operator of the rig. It has also been identified by the United States Coast Guard as a "Responsible Party" for oil discharges that came from the rig. It may be served through, Keelan Adamson, President, 4 Greenway Plaza, Houston, Texas, 77046, or its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, Texas, 78701.

13.    Defendant Transocean Holdings LLC is organized under the laws of Delaware, with its principal place of business in Houston, Texas. It has represented that it is an owner, managing owner, owner *pro hac vice*, operator, and/or contract operator of the *Deepwater Horizon* drilling rig. It has also been identified by the United States Coast Guard, as the "owner" of the *Deepwater Horizon*, a "Responsible Party" for oil discharges that came from the rig. Transocean Holdings, Inc. may be served through John H. Briscoe, President, 4 Greenway Plaza, Houston, Texas, 77046, or through its registered agent, Corporation Service Company, Inc., Corporation Trust Center, 1208 Orange Street, Wilmington, Delaware, 19801.

14.    Defendant Transocean Deepwater, Inc. is organized under the laws of Delaware with its principal place of business in Houston, Texas. It was the employer of the crew that

-6-

worked for Transocean aboard the *Deepwater Horizon* drilling rig, and has represented that it is an owner, managing owner, owner *pro hac vice*, and/or operator of the rig. It has also been identified by the United States Coast Guard as a "Responsible Party" for oil discharges that came from the rig. It may served through Eric Brown, Senior Vice President and General Counsel, 4 Greenway Plaza, Houston, Texas, 77046, or through its registered agent, Capitol Services, Inc., 615 South Dupont Highway, Kent, Delaware, 19901.

15.     Defendant Triton Asset Leasing, GmbH ("Triton") is an entity organized under the laws of the Swiss Confederation with its principal place of business in Zug, Switzerland. Triton was the lessor of the *Deepwater Horizon* drilling rig, and has represented that it is an owner, managing owner, owner *pro hac vice*, and/or operator of the rig. It has also been identified by the United States Coast Guard as a "Responsible Party" for oil discharges that came from the rig. Service on Triton may be accomplished by personal service on Triton at its principal place of business located at Turmstrasse 30, CH-6300, Zug, Switzerland c/o Transocean Deepwater Drilling, Inc., 4 Greenway Plaza, Houston, Texas, 77046; and/or pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, to which the Swiss Confederation is a signatory.

### III.

### JURISDICTION AND VENUE

16.     This lawsuit is properly before this Court pursuant to Article 4, Section 7 of the Delaware Constitution because Plaintiff is seeking legal damages.

17.     The Court has subject matter jurisdiction over this action.

18.     This Court has personal jurisdiction over all Defendants because they each are either organized under Delaware law or transact business in this state.

-7-

## IV.

## FACTUAL BACKGROUND

### A.    The St. Joe Company – A Proud History

19.    In 1926, Alfred Irene DuPont began acquiring large tracts of land in Florida that would one day form the nucleus of St. Joe's assets. DuPont died in 1935, leaving the majority of his assets in a charitable trust and appointing Edward Ball as head of his business conglomerate. Ball incorporated the St. Joe Paper Company in 1936 using the vast timberlands acquired by DuPont. By the 1970s, St. Joe's pulp and paper operations were among the largest in the United States. Ball ran St. Joe Paper until his death in 1981. At that time, St. Joe was the largest private landowner in Florida, having amassed over 1.2 million acres to support its pulp and paper operations.

20.    In the 15 years following Ball's death, St. Joe continued to prosper. However, the company did not take full advantage of the inherent value of its enormous land holdings, its various businesses, or its cash reserves. St. Joe decided to narrow the scope of its operations to focus on its most valuable asset – its real estate holdings – and reorganized itself as a real estate development company. To that end, in May 1996, St. Joe sold its paper mill and cardboard container plants for an aggregate price of $390 million. St. Joe Paper Company changed its name to the St. Joe Corporation and later to The St. Joe Company.

### B.    The "New" St. Joe:  A Vision for A Prosperous Northwest Florida

21.    In the late 1990s, St. Joe expanded its operations and began to convert itself into a real estate development company. Throughout the balance of the 1990s and the first decade of the 21st Century, St. Joe created many master-planned communities and commercial projects across Florida.

-8-

22.    In September 2006, St. Joe declared a sweeping reorganization of its operational structure designed to refocus the company on long-term growth opportunities while capturing operating efficiencies.   Pursuant to that plan, St. Joe merged its operating units into one integrated organization.   In essence, the reorganization was borne out of a desire to focus St. Joe's business plan on developing its vast real estate holdings in Northwest Florida.

23.    Throughout 2007, St. Joe completed the sale of its seventeen building office portfolio and its North Carolina homebuilding operations.

24.    In 2008, St. Joe completed an equity financing and used the proceeds to pay off substantially all of its debt.  Having eliminated short-term debt constraints, the Company was positioned to preserve its land holdings and focus on its long-term value creation opportunities in Northwest Florida.

25.    During 2009, St. Joe divested its remaining real estate assets in Central and Southern Florida.

26.    St. Joe also devoted significant resources to promoting the long-term economic success of Northwest Florida by facilitating numerous infrastructure improvements in the region, including new hospitals, roads, schools and, most importantly, a new international airport.

27.   In May 2010, years of strategic planning, regulatory efforts, legal successes, and infrastructure development culminated in the opening of the new Northwest Florida Beaches International Airport near Panama City.  The opening of the airport is a key component in the development of land holdings marked for industrial, commercial, and residential real estate activity in the surrounding area.

#13293167 v1

28.     The new airport is located within a 75,000 acre tract known as the West Bay Sector Plan, which the Company plans to use as a catalyst for regional growth and increased demand for all St. Joe real estate holdings.

29.     In October 2009, St. Joe entered into a Strategic Alliance Agreement for Air Service with Southwest Airlines ("Southwest"). Pursuant to the agreement, Southwest is now providing air service to Northwest Florida via Northwest Florida Beaches International Airport. St. Joe believed its commercial opportunities would be significantly enhanced by Southwest's planned service to the region. In fact, all pieces necessary for implementation of the master plan were in place when St. Joe announced its development activity at its VentureCrossings Enterprise Centre – one of the nation's largest office, retail, hotel and industrial developments – which will encompass the first 1,000 acres to be developed within the 75,000-acre West Bay Sector Plan adjacent to the airport site.

30.     In support of its commitment to the West Bay Sector Plan, St. Joe senior management announced, in March 2010, that St. Joe would relocate its headquarters from Jacksonville, Florida to its new VentureCrossing Enterprise Centre. On April 12, 2010, just days before the *Deepwater Horizon* explosion, St. Joe publicly announced the launch of VentureCrossings Enterprise Centre.

31.     St. Joe's strategic alliances and its long-term visionary goals positioned the company as a frontrunner in the future development of the Northwest Florida corridor. The new airport is in close proximity to seven military bases, providing substantial incentives for aviation, aerospace and defense contractors to move into the region, which it was hoped would combine with the beauty of the surrounding area to entice other commercial and residential buyers to relocate to Northwest Florida.

-10-

32.    Thus, on April 20, 2010, St. Joe was poised to reap the benefits of a new era of economic prosperity in Northwest Florida – one which it had worked so hard to promote over the prior decade.  That was the state of things until the *Deepwater Horizon* disaster.

## C.    Transocean And BP – Partners In The Maxim "Profits Over Safety"

33.    Since its formation, Transocean has worked with BP on numerous drilling projects around the world.  Indeed, BP has been Transocean's most significant customer for over a decade.  Transocean manages 25% of BP's offshore drilling rigs worldwide, and 63% of BP's rigs operating in U.S. waters.  In 2009, BP accounted for 12% of Transocean's $11.6 billion in operating revenue – approximately $1.4 billion in the year prior to the *Deepwater Horizon* disaster.

### 1.    Transocean's dismal safety record

34.    Transocean's safety record prior to the *Deepwater Horizon* disaster was, by any measure, deplorable.  Since 2005, the U.S. Minerals Management Service ("MMS")[1] – the agency responsible for overseeing rig safety – has investigated four fires that occurred on drilling rigs owned by Transocean.  According to an analysis of MMS safety records conducted by the *Wall Street Journal*, since 2008 nearly 75% of the "incidents" that triggered federal investigations into safety or other regulatory violations on drilling rigs operating in the Gulf were on rigs owned by Transocean.  In fact, in 2009 Transocean's Board of Directors eliminated all executive bonuses that year as a result of the company's poor safety record.

35.    In fact, the same failures that contributed to the destruction of the *Deepwater Horizon* had previously occurred on drilling rigs owned and operated by Transocean.  For example, in 2005, a well being drilled by a Transocean rig leaked drilling fluid because of a poor

---

[1]    Since the oil spill, MMS has been re-designated the Bureau of Ocean Energy Management, Regulation, and Enforcement.

cement seal. Transocean has a long history of problems with the blowout preventers aboard its rigs. In 2005, the British government cited Transocean for failing to properly maintain a remote blowout preventer control panel aboard a rig operating in the North Sea. In 2006, MMS personnel found that a blowout preventer on one of Transocean's other rigs was not operating due to poor maintenance. Later that same year, the blowout preventer on another Transocean rig leased to BP failed because of a fluid leak with the result that significant amounts of toxic drilling fluid were discharged into the Gulf before a robotic submarine was able to remotely shut down the well.

36.     In a particularly chilling portent of the *Deepwater Horizon* disaster, in December 2009, the Transocean rig *Sedco 711* experienced a blowout while completing operations at an exploratory well in the North Sea. Transocean's own internal investigation attributed the incident to human error, in particular: (i) the crew's decision to begin displacing drilling mud in the well with lighter seawater before confirming that the well was properly sealed; (ii) the crew's failure, during displacement operations, to detect a powerful surge of gas in the well, a "kick;" and (iii) the fact that the rig's emergency alarm system had been intentionally turned-off eight months prior to the blowout. Luckily for the residents and businesses along the North Sea coast, the *Sedco 711*'s blowout preventer successfully shut down the well after the crew lost well control.

37.     On April 14, 2010, six days before the *Deepwater Horizon* disaster, Transocean's management distributed a report on the *Sedco 711* blowout that recommended specific changes to Transocean's well control procedures aimed at preventing blowouts during mud displacement. These recommendations, if followed, would likely have prevented the *Deepwater Horizon*

-12-

disaster. Incredibly, the recommendations were not distributed to any of Transocean's rigs operating in the Gulf.

**2.  BP's corporate culture – profit first – safety and the well being of people and the environment – a distant second.**

38.     As the relationship between BP and Transocean flourished, BP sought to position itself publicly as an "Intelligent Energy" company, allegedly exploring the frontiers of energy resources with cutting edge technology that was environmentally and safety conscious. For example, in a speech delivered on March 23, 2010, BP executive Doug Suttles ("Suttles") noted that:

> Deepwater has meant pushing our boundaries in several ways besides the sheer depth of water and wells. We've developed the capability to create advanced floating production facilities, complex riser systems and subsea equipment, and the ability to integrate these elements to cope with extreme temperatures, pressures and oceanographic conditions . . . . How we improve the decision making and capability of our people will also be a significant source of future value. Effective decision making is about getting the right data and information, as quickly as necessary, to the people with the skills to analyze and act, wherever they might be in the world.

In reality, however, BP shamelessly and deliberately ignored these values of safety, appropriate technology, wise decision-making, and due care. Instead, BP cynically pursued profits over principle, and in the process amassed the worst safety record in the oil exploration, production and refining industries. In the past ten years, BP has been fined repeatedly for its cavalier disregard for the health and safety of others.

39.     For example, in 2005, an explosion occurred at a refinery in Texas City, Texas, owned and operated by BP Products North America, Inc. ("BP Products") which killed 15 people and injured 180 others. The United States Chemical Safety and Hazard Investigation Board concluded that BP Products knew about risky practices at the refinery before the blast but did

-13-

nothing about them. The investigative board's report stated that the many failures that culminated in that tragic event could be traced all the way from Texas to BP's headquarters in London and disclosed that "[w]arning signs of a possible disaster [at the refinery] were present for several years, but company officials did not intervene ... to prevent it." BP Products pled guilty to criminal violations of the Clean Air Act and was fined $50 million.

40.     Even after the Texas City refinery explosion, BP failed to take its obligations seriously.  Last year, the United States Occupational Safety and Health Administration ("OSHA") imposed an $80 million fine on BP Products – the largest penalty in OSHA's history – for failing to correct hundreds of safety violations at the Texas City refinery.  In fact, in a study of OSHA records conducted by the Center for Public Integrity, it was found that, since 2007, two oil refineries owned and operated by BP Products – the Texas City and Toledo refineries – have been responsible for an astounding 97% of all "egregious willful" citations issued by OSHA to companies in the refining industry.  In light of these statistics, Jordan Barab, the United States Deputy Assistant Secretary for Labor for Occupational Safety and Health, stated that the "only thing you can conclude is that BP has a serious, systemic safety problem in their company."

41.     Of course, Transocean was well aware of BP's dismal safety record, and yet still pursued lucrative assignments from BP, including its contract on the *Deepwater Horizon*.  It is then, sadly, not surprising that both BP and Transocean would repeatedly – throughout the drilling process on the *Deepwater Horizon* – opt to ignore industry standards, accept and follow grossly inadequate procedures, refuse to report blatant regulatory violations, fail to employ additional safety mechanisms and technologies available to them, and cut virtually every corner because the "right" course would have cost more than the "wrong" course. Clearly, Transocean willingly turned a blind eye to safety and the environment, and placed the preservation of its

-14-

profitable relationship with BP over its obligations to St. Joe and all the many others plainly within the scope of the foreseeable risk if something went wrong.

**D.      BP Purchases Lease Rights To The Macondo Prospect.**

42.     In March 2008, BP was the highest bidder in an auction conducted by the MMS for the right to conduct oil exploration, drilling, and production operations at the Macondo Prospect.  The site is located less than 50 miles off the coast of Louisiana, in an area designated on the Outer Continental Shelf as Block 252, Mississippi Canyon.

43.     In 2009, BP filed an exploration and environmental impact plan with MMS which revealed its plan for drilling operations at the Macondo Prospect.  In that plan, BP represented that it was "unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities."  Relying on BP's representation, MMS exempted BP from conducting a detailed environmental impact study.

44.     At various times thereafter, BP sold interests in the lease to MOEX Offshore 2007, LLC ("MOEX"), Anadarko E&P Company LP, and Anadarko Petroleum Company ("Anadarko").   At the time of the Incident, however, Anadarko E&P Company LP no longer held an interest in the lease.  Instead, BP held a 65% interest in the lease, Anadarko held a 25% interest, and MOEX a 10% interest.

45.     On December 17, 2009, BP, MOEX and Anadarko entered into a joint operating agreement (the "Joint Agreement") regarding drilling operations at the Macondo Prospect. Pursuant to that agreement, BP was the designated "Operator" of the well.

**E.** **Transocean Is Hired To Safely Manage And Conduct Drilling Operations At The Well.**

1. **Transocean had "overall responsibility for everything" having to do with drilling operations on the *Deepwater Horizon*.**

46. The *Deepwater Horizon* was an ultra-deepwater oil rig built in 2001 by Hyundai Heavy Industries of South Korea. It was originally commissioned by R&B Falcon Corporation, which merged with Transocean Sedco Forex, Inc. in 2001. As a result, ownership of the *Deepwater Horizon* was transferred to Transocean in August 2001. At the time of the incident, the *Deepwater Horizon* was owned by Transocean, and leased to BP through Triton.

47. Although BP was the lessor of the *Deepwater Horizon* and the "Operator" of the well under the Joint Agreement, Transocean was responsible for maintaining and operating the rig, as well as day-to-day drilling activities. Under applicable MMS regulations, Transocean is also ultimately responsible for maintaining well control at the drilling site. As stated by Jimmy Harrell ("Harrell") – Transocean's Offshore Installation Manager ("OIM") for the *Deepwater Horizon*, as the senior Transocean official aboard the rig he had "overall responsibility for everything" having to do with drilling operations, and was "responsible for the safety of everyone" on the rig.

2. **Transocean failed to maintain the *Deepwater Horizon* in proper repair and working order.**

48. Prior to its destruction, the *Deepwater Horizon* was well known for its dismal record of mechanical and operational problems. Many of these problems resonated from Transocean's now obvious lack of proper policies and procedures. For example, in 2008, the rig flooded so badly that it began to tilt after a worker, without any training or procedures to follow, removed piping below the waterline that was needed to prevent the influx of seawater.

-16-

49.     Transocean's rig lease with BP required Transocean to conduct only two days of maintenance on the *Deepwater Horizon* every three months.  Given this minimal commitment to maintaining the rig, it is no surprise that a safety audit of the *Deepwater Horizon* conducted by BP in September 2009 uncovered major maintenance issues.  In nearly 300 instances the audit found that Transocean had not conducted mandated inspections of equipment on the rig in a timely manner.  Among the failures was the failure to inspect the blowout preventer whose inspection was at least five years overdue.  The safety audit concluded that Transocean's crew on the *Deepwater Horizon* had inadequate training and knowledge of drilling operations, and that Transocean had no structured or documented program in place to ensure the crew's technical competence.

50.     In addition, the audit identified 390 items on the rig that were in immediate need of mechanical repair.  Some of these mechanical problems – such as the fact that the rig's water tight doors were not operating properly and that two of its four engines were periodically shut down – were of such high priority that a temporary halt to all drilling operations was ordered until they could be addressed.  Five days later, however, operations at the *Deepwater Horizon* resumed even though all repairs had not been addressed.  Transocean's Chief Engineer aboard the rig, Stephen Bertone ("Bertone"), testified before a Board of Investigation into the disaster conducted by the U.S. Government that he could not recall how many of the problems identified in the safety audit had been corrected as of the date of the explosion.

51.     This inherently dangerous state of affairs was confirmed by a confidential survey of workers on the *Deepwater Horizon* conducted by Lloyd's Register ("Lloyd's"), a risk management company retained by Transocean, in the weeks before the rig's destruction.  The survey confirmed "unsafe behaviors on the rig" with regard to drilling operations and that

-17-

crewmembers feared reprisals if they reported their safety concerns to their supervisors. In the opinion of workers on the rig, when safety issues were investigated, Transocean's focus was on attributing blame rather than determining how to avoid a similar incident in the future. As one crewmember put it, "when someone fails or has an incident, they focus on the paper rather than the process . . . ."

52. The survey also included the prophetic lament that "drilling priorities take precedence over planned maintenance." Crewmembers expressed the belief that required maintenance aboard Transocean's rigs was systematically deferred so that Transocean could continue to collect the hundreds of thousands of dollars in daily lease fees it received for its vessels. Lloyd's concluded that "[t]here were . . . questions surrounding the retention of skilled personnel, competency levels for some personnel, and of processes in place for competency development and assurance."

## F. Ignorance Is Bliss: Transocean Ignored Multiple Warning Signs That Drilling Operations At The Well Were Unsafe.

53. Drilling operations at the well began on October 7, 2009. The intention was to drill an exploratory well and then cement and plug the well temporarily for later completion as a subsea producer of crude oil. The original plan called for drilling operations on the exploratory well to take 51 days and to cost $96 million.

54. Almost from the beginning, however, significant problems were encountered at the well site. The original drilling rig on site was the *Marianas*, but it was damaged in Hurricane Ida. The *Deepwater Horizon* was then transferred to the site and drilling began again on February 6, 2010.

55. Shortly thereafter, the *Deepwater Horizon* experienced serious problems at the drilling site, including various incidents related to sudden and unexpected releases of gas from

the wellbore, called "kicks." In one instance, the rig's operations had to be completely shut down after a severe gas kick pushed so much gas up the riser that senior crew officials feared it would ignite.

56.     There were also problems with the blowout preventer. Transocean was responsible for inspecting, maintaining, and certifying the blowout preventer, which is not only the well's last line of defense against the unchecked discharge of gas, oil, and other pollutants once there has been a loss of well control, but is also used to conduct critical well pressure tests. MMS regulations, at CFR § 250.446(a), require that a "major inspection" of the blowout preventer be conducted every three to five years. Transocean, however, had not conducted such an inspection on the *Deepwater Horizon*'s blowout preventer in nearly ten years.

57.     In addition, prior to the *Deepwater Horizon*'s explosion, there had been unexplained fluid leaks from the subsea pods on the blowout preventer, as well as from its test ram. MMS regulations require that, in such circumstances, the blowout preventer be pulled for inspection and the problem reported to MMS. Transocean did neither.

58.     In addition to all of the above, Transocean intentionally disabled a critical component of the blowout preventer prior to the rig's explosion. The so-called "mini-purge" system is designed to prevent gas from escaping onto the drill floor of a rig. The *Deepwater Horizon*'s mini-purge system had a history of electronic problems that repeatedly caused the blowout preventer's control panel to lock up. Incredibly, instead of resolving this issue, Transocean recklessly directed that the system be bypassed.

59.     Finally, approximately one month prior to the disaster, the *Deepwater Horizon*'s crew accidentally caused tens of thousands of pounds of excess pressure to be applied to the primary rubber gasket on the blowout preventer – called the "annular" – during a test of the

system. As a result, the drill pipe was dragged about 10-15 feet through the annular after it had been closed. Shortly thereafter, approximately 16 ounces of rubber was pulled from the drilling fluids circulating through the well. At least one member of Transocean's crew believed the rubber to be a sign that the annular was damaged, rendering the blowout preventer incapable of functioning. However, when he brought it to the attention of Jimmy Harrell, the senior Transocean official aboard the rig, Harrell refused to order any inspection or testing of the annular to determine its continued fitness.

60. As each of these problems arose, the drilling schedule fell further and further behind. BP's response was to increase the pressure on the *Deepwater Horizon*'s crew to "bump up" the drilling effort. However, the effort to "speed up" the drilling damaged the geological formation at the bottom of the well hole to such an extent that it caved in and swallowed up drilling tools and mud. This "cave in" forced BP to abandon the initial wellbore and begin again at a cost of $25 million and a loss of considerable time. According to Mike Williams, a Transocean electronics technician on the *Deepwater Horizon*, it also caused BP to further increase its demands that the rig's crew complete drilling operations at the well at a dangerously shortened pace.

61. Thus, Transocean knew that its ability to control the well was tenuous, and that it faced a particularly strong blowout risk. As stated by Brian Morel, a BP drilling engineer, in an email to a BP colleague on April 14, 2010, "this has been a nightmare well which has everyone all over the place." The *Deepwater Horizon*'s crew nicknamed it the "well from hell." Indeed, even the typically passive MMS recognized that conditions at the Macondo Prospect mandated care and not expediency. On April 6, 2010, it warned BP to "[e]xercise caution while drilling due to indications of shallow gas and possible water flow."

-20-

62.     Unfortunately, neither BP nor Transocean were willing to put such caution before profits.  The *Deepwater Horizon* operation was expensive to operate, with lease costs to BP alone totaling $500,000 per day.  And, of course, there were additional costs for contractors' fees to Halliburton, MI-SWACO and others.  At the time of the explosion, the rig was 43 days late for its next drilling location, which meant that BP had already incurred more than $21 million in additional leasing fees alone.  As a result, Transocean was willing to recklessly continue to work without adequate safety measures on a gas kick-prone well being drilled at tremendous depth, in order to satisfy its most lucrative customer.

**G.      Transocean's Central Role In The *Deepwater Horizon* Explosion**

63.     Both Transocean's senior manager aboard the *Deepwater Horizon*, Jimmy Harrell, and the rig's Chief Engineer, Steve Bertone, testified before the Board of Investigation that Transocean had the authority to "shut down the rig" at any time if it believed that drilling operations were being planned or conducted in an unsafe manner.  That authority extended even to those situations where BP's senior officials on the rig, Donald Vidrine and Robert Kaluza – known in the industry as the "Company Man" – ordered the risky procedures at issue.  As stated by Harrell, "[w]e don't just do it because the Company Man says to do it."

64.     In practice, however, that is exactly what Transocean did aboard the *Deepwater Horizon*.  At various critical junctures in the weeks before the explosion, Transocean acquiesced to BP's desire to speed-up well completion operations and made drilling decisions based on cost-savings rather than its obligation to protect the safety and well-being of the crew, the environment, and residents and businesses of the Gulf region.

-21-

1.  **Transocean's failure to ensure that well completion plans were properly designed to maintain well control renders it legally responsible for the blowout.**

65.     While drilling and well completion plans were prepared by BP, it was Transocean's job to implement those plans – and to ensure that well control and rig safety were not compromised while doing so.  As such, Transocean was advised by BP of all plans and given an opportunity to raise specific concerns and recommend changes that would enhance well control.  However, instead of exercising its authority to veto drilling plans that put well control [and the safety of the crew and the environment] at significant risk, Transocean went along with a series of reckless decisions by BP that ignored accepted industry practices by failing to properly account for the well's notorious history of gas kicks.

66.     For example, Transocean agreed with BP's plan to seal the well using a single string of production casing, rather than a liner and tieback.  The liner/tieback option was costlier and more time-consuming, but clearly safer because it provided four redundant barriers to oil and gas escaping from the well in the event of a failure of the well's bottom primary cement seal, whereas the casing string option provided only two such barriers.  Even BP's own drilling engineers characterized the casing string option as unsafe in light of the well's severe gas problems.  Transocean, however, failed to exercise its right to insist on the use of a well sealing option that maximized the chances of controlling gas kicks and preventing a blowout.

67.     Transocean also went along with a series of other decisions regarding the well sealing plan that also increased the chances for a blowout.  For instance, the American Petroleum Institute ("API") states that it is "best practice" to conduct at least one "bottoms up" procedure – whereby the drilling fluid is fully circulated from the top to the bottom of the well – before final cementing to seal a well is conducted.  Among other things, the procedure permits crewmembers to detect if gas is infiltrating the well, making it an especially important safeguard for gas kick-

prone wells such as the one at the Macondo Prospect. Transocean was aware of this recommendation, but also knew that BP objected to the procedure because it would have taken as long as twelve hours to conduct, thereby delaying the *Deepwater Horizon*'s move to its next drilling site. Eager to placate its biggest client, Transocean failed to insist that a full "bottoms up" circulation of drilling mud be conducted before the final cement job on the well was begun.

68.     Given its knowledge and experience in offshore drilling operations, Transocean's repeated failures to exercise its power to object to and/or veto well completion plans that were plainly unsafe in light of known drilling conditions and industry practices were not only a shocking breach of its self-stated commitment to stop any operation that compromised safety and well control, but also a violation of 30 C.F.R. § 250.401, which required Transocean to take all necessary steps to maintain well control.

### 2.     Transocean's failure to conduct well completion operations in an appropriate manner renders it legally responsible for the blowout.

69.     Transocean compounded its failure to ensure that well completion plans were appropriate by the grossly negligent manner in which it conducted final drilling and completion operations. The result of Transocean's grossly negligent and unsafe operations was the destruction of the *Deepwater Horizon*, the tragic loss of life that ensued, and the catastrophic environmental and economic consequences to the Gulf's ecosystem, its residents and businesses.

70.     As an initial matter, *any* operation aimed at sealing the well at the time the attempt was made was inherently unsafe because of Transocean's failure to maintain critical emergency safety systems such as the blowout preventer in working order.

71.     In a decision that would prove to have particularly catastrophic consequences, Transocean both acquiesced in, and helped implement, BP's plan to displace heavy drilling fluid, or "mud," from the well and replace it with lighter seawater before the well's final cement plug

was put into place. In doing so, Transocean was fully aware that heavy drilling mud placed in the wellbore is the primary barrier against a blowout. Accordingly, it should not be removed until the crew is certain that the cement plug has successfully sealed the well and will prevent oil and gas from escaping up the drilling column. In the case of the *Deepwater Horizon*, however, Transocean permitted the "mud" to be removed from the well without *any* definitive confirmation that the cement plug had successfully sealed the bottom of the well.

72.     Specifically, Transocean knew that, in conjunction with its plan to begin displacing drilling mud prematurely, BP had also decided to forego a cement bond log, which is the only test that could have confirmed that the well had been properly cemented to prevent the upflow of gas and oil from below. Gordon Aaker, a drilling engineer and failure analysis expert testified before the House Energy and Commerce Committee that the failure to conduct a cement bond log on the *Deepwater Horizon* was "horribly negligent." Transocean, however, failed to insist that the test be conducted before well completion operations continued.

73.     Transocean's decision to permit the drilling mud to be removed was grossly negligent in light of the fact that its own senior employee on the rig (Harrell) specifically objected to conducting that procedure before the final cement plug on the well was in place. He did so during a "skirmish" with a BP "Company Man" on the rig, Robert Kaluza ("Kaluza"), on the day that the *Deepwater Horizon* exploded. After this meeting, Harrell allegedly commented that, "I guess that's what we have those pinchers for" – referring to the shear rams on the blowout preventer designed to cut and seal the drilling column in an emergency. It is not surprising that when forced to testify about these events, Kaluza invoked his Fifth Amendment right against self-incrimination and refused to testify about this meeting – or any other events related to the Incident.

74.     In short, even though Transocean's senior manager on the *Deepwater Horizon* believed the planned mud displacement procedure was inherently dangerous, Transocean did not exercise its power to either insist that appropriate procedures be followed or shut down operations until such changes were made. In doing, Transocean failed in its duty to ensure the safety of its own crew and all the many others damaged by the disaster that occurred. These failures belie Transocean's stated vision that "if a job or something is seen that is not safe, the job is stopped."

75.     Transocean's decision to oversee the displacement of drilling mud before ensuring that the well was properly sealed is all the more incomprehensible given that Transocean had previously concluded that such a decision had been a major contributing factor to the blowout at the *Sedco 711* drilling site in December 2009. Transocean's management, however, failed to make sure that the *Deepwater Horizon*'s crew were aware of changes to Transocean's well control procedures following the *Sedco 711* incident that were specifically aimed at ensuring greater vigilance against gas "kicks" while displacing drilling mud.

76.     Moreover, after mud displacement began, Transocean either did not recognize, or ignored, other warning signs of an influx of gas into the well. According to BP, shortly after mud displacement was begun, fluid volume data from the well showed that approximately 39 barrels of fluid were *gained*, indicating that gas was entering the well. However, Transocean failed to take any well control actions at that time. It appears that neither Transocean nor the mudloggers were monitoring the fluid during this time period.

77.     Transocean's failure to recognize obvious signs of gas influx into the well during this period reflects a grossly negligent lack of training and preparation of its crew in well control operations. While Transocean's *Well Control Handbook* generally states that a well is to be

-25-

monitored at all times, it contains no specific guidelines on how to do so during well completion activities, such as mud displacement.

78.     Transocean also failed to configure the *Deepwater Horizon*'s fluid monitoring equipment to account for the fact that, in conducting well completion operations, some of the drilling mud was being offloaded to a nearby vessel – after which it was to be taken to a remediation facility for reuse – at the same time that mud was also was being circulated back to the mud pit room and negative pressure tests were being conducted on the well. Specifically, the equipment was not available to separately record how much of the drilling mud was being offloaded to the vessel, and how much was separately being circulated back to the mud pit room. As a result, the *Deepwater Horizon*'s mud logging contractor could not accurately monitor the volume of drilling mud being displaced from the well. That information is critical, however, because a loss of drilling mud – *i.e.* the fact that more mud was put into the well than was coming out – is a sign that there is a hole in the wellbore that is letting gas into the well. The procedure used also made it more difficult to conduct accurate testing to determine if gas was present in the mud being displaced from the well.

79.     Given these multiple red flags, the well's documented history of significant gas "kicks," the prior problems with the blowout preventer, and the decision not to conduct a cement bond log, Transocean never should have allowed the drilling mud to be removed before the well's final cement plug was in place. Transocean should have shut down the well once multiple warning signs of gas influx into the well were present. However, instead of adhering to its own standards, Transocean oversaw the dismantling of the well's first line of defense against a blowout – the drilling mud – even as the well gave clear signs that a catastrophe was imminent,

#13293167 v1

and even as Transocean knew that the *Deepwater Horizon*'s last line of defense – the blowout preventer – was not fully operational.

### 3. When the lower well seal failed, the *Deepwater Horizon* was engulfed in flames after its key emergency systems fail to operate.

80.     Ultimately, Transocean's wanton and reckless decisions at the well enabled the catastrophe to occur. At approximately 9:45 p.m. CST on April 20, 2010, the lower cement plug failed. Without sufficient drilling mud to hold it back in the well reservoir, methane gas shot up the drilling column and onto the platform of the *Deepwater Horizon*. Professor Robert Bea, a drilling expert who has been hired by the U.S. government to help it investigate the disaster, has stated that it is "unlikely" that the well would have blown out had the drilling mud been left in place.

81.     Transocean's own grossly negligent actions in responding to the blowout made the situation worse. It now appears that Transocean's decision to divert the mud in the manner described above  actually caused gas to be vented directly onto the rig's platform. That gas then ignited, and the *Deepwater Horizon* was engulfed in flames as its fire and gas preventive systems failed to suppress the conflagration. Eleven workers lost their lives.

82.     Both the blowout preventer and the emergency disconnect system, which were negligently "maintained" by Transocean, failed to operate.   Indeed, in a post-Incident examination of the two control pods that should have automatically triggered the blowout preventer after the explosion, it was found that the battery in one pod had an insufficient charge, and the other pod had a malfunctioning solenoid valve. Either condition renders the pods unable to trigger the blowout preventer.  The rig's general alarms also never sounded because Transocean had intentionally turned them off.  Two of the rig's engines then shut down and all

#13293167 v1

electrical power was shut off. When Transocean employees tried to trip the backup generator, it failed to activate.

83. As the fire on the platform raged on unabated, the remaining crewmembers were forced to abandon the rig. The *Deepwater Horizon* burned for two days until it finally sank on April 22, 2010.

### 4. Transocean's direct responsibility for the *Deepwater Horizon* disaster

84. Despite its specialized knowledge and experience as the world's largest offshore drilling company, throughout the drilling process at the Macondo Prospect, and especially during the final phases of sealing the exploratory well, Transocean made deliberate decisions to operate and maintain the *Deepwater Horizon* in a manner that it knew were grossly negligent, inherently flawed, and not in compliance with applicable regulations and international safety standards. Transocean also willfully ignored repeated safety and operational violations by BP and others at the well.

85. Instead of maintaining the rig in good working order and repair, Transocean chose to continue to collect its leasing fees from BP without interruption. Instead of implementing procedures at the "well from hell" to ensure that drilling operations were conducted in a prudent manner, Transocean opted to accommodate its highest paying client's repeated requests to "speed-up" the well completion schedule as it fell further and further behind. Instead of insisting that required testing be done to ensure that the well was properly sealed against hydrocarbon influx, and shutting down the well in the face of multiple signs that a blowout was imminent, Transocean willingly made a series of decisions that compromised rig safety and well control in the name of expediency. Transocean, therefore, is fully liable for the deaths of the eleven members of the *Deepwater Horizon*'s crew, the unfathomable amount of pollution in the Gulf,

the extraordinary effects on the Gulf's marine and coastal ecosystems, and the disastrous economic consequences to millions of Gulf residents and businesses, including St. Joe.

**H.**     **The Damage Done: The Resulting Environmental And Economic Catastrophe**

    **1.**     **Millions of barrels of oil and other pollutants have been discharged into the fragile waters of the Gulf.**

86.     Because the rig was "dead" after the explosion, meaning it had no engine power and its backup generators had failed, it was unable to disconnect from the marine riser. As a result, while sinking to the seafloor it pulled the riser down with it, bending and breaking the pipe before finally tearing away from the riser completely at about 1,500 feet above the seabed. Massive amounts of crude oil and other hydrocarbon pollutants immediately began spewing into the Gulf. This continued until July 15, 2010, when BP finally managed to install a makeshift cap on the damaged riser and halt the flow of oil.

87.     The pollutants from the *Deepwater Horizon* incident were so massive that they formed a rainbow-colored slick across the Gulf's surface large enough to be seen from outer space. The slick spread with the wind and currents to the coastlines of Louisiana, Mississippi, Alabama, and Florida, and there has yet to be an accurate estimate of the actual volume of oil spilled into the Gulf because of the Incident. However, estimates have ranged from approximately 53,000 barrels per day to 100,000 barrels per day, the latter estimate comes from BP's own internal documents. Even using the more conservative flow rate of 53,000 barrels per day, the well discharged more pollutants every four to ten days than the entire volume of oil that leaked from the *Exxon Valdez* in 1989.

88.     Multiplying these flow rates by eighty-seven days, the estimated total volume of oil discharged into the Gulf from the well would range from approximately 194,000,000 gallons to over 365,000,000 gallons, making it the worst known oil spill disaster to date. The most

recent U.S. Government estimates place the total volume at about 5 million barrels, or about 210 million gallons. Samantha Joye, a researcher for the University of Georgia, has explained the impact of such a massive volume of oil introduced into the Gulf, stating that "[t]here's a shocking amount of oil in the deep water, relative to what you see in the surface water. There's a tremendous amount of oil in multiple layers, three or four or five layers deep in the water column."

### 2. The devastating impact on the Gulf's ecosystem

89. The impact of the oil and other pollutants discharged into the Gulf because of the Incident has been devastating on the marine and other wildlife of the Gulf. However, because of the unprecedented size of the disaster, the devastation will take years to assess. Terri Rowles, NOAA's Director of Marine Mammal Health and Stranding Response has noted that impacts on "species living in deep water, like sperm whales, may not be detected" because dead whales simply disappear beneath the waves. Likewise, Rowan Gould, Acting Director of the U.S. Fish & Wildlife Service, noted that the *Deepwater Horizon* spill "is significant and in all likelihood will affect fish and wildlife across the Gulf, if not all of North America, for years if not decades . . . ."

90. The oil slick from the *Deepwater Horizon* disaster first made landfall on the Louisiana coastline on April 30, 2010. Over the next weeks, elevated southerly winds pushed the perimeter of the spilled oil east to the Northwest Florida shoreline. The first oil from the spill came ashore on the Northwest Florida coast on June 4, 2010, when tar balls washed up onto Pensacola Beach.

91. Tar balls from the oil spill caused by the Incident initially washed onto St. Joe's beaches on June 19, 2010. On that day, tar balls were spotted and removed from the beaches at both WaterColor and WaterSound Beach. Both resorts are St. Joe properties located in Walton

County, Florida. Oil then continued to wash ashore along the Northwest Florida coast. Today, unseen undersea oil plumes pose a constant threat to beaches and the entire coastal zone. It is clear that Northwest Florida has and will continue to suffer enormous economic impact for years to come as a result of actual damage to its coastline, as well as people's negative perception of the Northwest Florida coast as a damaged region.

## I. The Damage To St. Joe

92.     Prior to April 20, 2010, St. Joe had invested considerable resources positioning itself to capitalize on the last great frontier of development available on Florida's Gulf Coast. As the owner of approximately 577,000 acres of land, approximately 70 percent of which are on or within 15 miles of the Northwest Florida coastline, the company's strategic plan hinged on the master development of its own land as well as the entire Northwest Florida region. Clearly, St. Joe was uniquely positioned to capitalize on the opportunities available as this area began to emerge from the recession, both for its own benefit and for the collective prosperity of the communities in that region. Indeed, the new airport, which opened in May 2010, was set to be an important catalyst in attracting new businesses – and their many employees – to the region.

93.     Not surprisingly, the financial markets have positively reflected the importance of the opportunities provided by St. Joe's master plan. St. Joe's stock price hit a 52 week high of $37.44, on April 29, 2010. Since that day, however, as the magnitude of the environmental and economic devastation wreaked by the Incident has become apparent, St. Joe's stock has plummeted more than 40 percent, closing at $22.08 only 39 days later. The resultant loss in market capitalization of approximately $1.4 billion reflects the perception of analysts and investors as to the loss in value of St. Joe's primary assets – its Gulf Coast land holdings.

94.     St. Joe is an innocent victim of Transocean's reckless pursuit of profits over the safety, environmental integrity, and economic health of an entire region. St. Joe has suffered

-31-

direct physical damages to its real estate and business interests from the oil and other pollutants discharged because of the *Deepwater Horizon* disaster.

95.     In addition, St. Joe's intrinsic enterprise value, its earning power, and the worth of its significant land holdings, are all inextricably tied to the continued environmental vitality of the Gulf.   Transocean's gross misconduct on the *Deepwater Horizon* has directly and proximately caused St. Joe to sustain significant financial losses.   St. Joe files this suit seeking to recover damages for the harm caused by Transocean and for punitive damages to punish Transocean for its gross negligence and callous indifference to the rights and safety of others.

## V.

## CLAIMS

**A.     Underline{Count One:  Negligence And Breach Of Duty Of Care}**

96.     St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

97.     Transocean owed St. Joe a duty of due care with respect to conducting offshore oil drilling operations in the Gulf including, among other things, the management and conduct of marine and drilling operations aboard the *Deepwater Horizon*.

98.     Transocean had a heightened duty of care because of the inherently dangerous nature of oil exploration and drilling activities.

99.     As set forth above, Transocean violated those duties by, among other things: failing to conduct its operations on the *Deepwater Horizon* in a safe and workmanlike manner; failing to use the best and safest drilling technology in those operations; failing to ensure well control; disregarding regulations promulgated by MMS; disregarding safety standards promulgated by the American Petroleum Institute; failing to take appropriate action to avoid or mitigate the Incident; and ignoring the data and evidence in its possession that indicated

-32-

Transocean's and/or BP's continued operations on the well seriously jeopardized the structural integrity of the well, as well as the safety and well-being of the *Deepwater Horizon* rig and its crew, thereby not only placing every person on the *Deepwater Horizon* in imminent danger of injury and death, but also threatening the fragile ecosystem of the Gulf, its natural resources, as well as the interests of all those who rely upon and benefit from them, including St. Joe.

100.    As a direct and proximate result of Transocean's negligence, St. Joe has sustained, and continues to suffer, substantial harm and injury.

101.    St. Joe has been damaged by the reduction in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns and/or manages on or near the Florida Gulf Coast, the loss of business, profits and revenue on or near the Florida Gulf Coast, the destruction of its enterprise value, and other economic losses, all as a direct result of the oil spill.

102.    Accordingly, St. Joe seeks to recover from Transocean monetary relief in the form of lost profits, impairment of earning capacity, and other economic losses caused by damage to real property and to natural resources from the oil spill that resulted from the Incident. St. Joe also seeks to recover from Transocean monetary relief in the form of actual damages to real property, economic damages, lost profits, loss of enterprise value and reduction in value of its property and assets.

**B.**    **Count Two:  Gross And Culpable Negligence**

103.    St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

104.    Transocean had a heightened duty of care to St. Joe because of the inherent danger associated with offshore deepwater drilling for oil from floating platforms, and the especially high risk of blowouts, explosions, and other dangers arising from operations, such as

the management and conduct of marine and drilling operations related to the offshore exploration and production of crude oil, that were being performed by Transocean at the time of the Incident, resulting blowout, and discharge of oil.

105.     The management and conduct of marine and offshore oil drilling operations by Transocean onboard the *Deepwater Horizon* presented a clear and present danger of injury. Transocean was aware of this danger when it voluntarily proceeded with its management and conduct of marine and drilling operations on the rig and at the well in an unreasonable and unlawful manner.  Transocean knew, or should have known, that its wanton and reckless conduct would foreseeably result in a disastrous explosion, blowout, and oil spill, causing damage to the real and personal property, as well as economic interests, of all those affected by the oil spill, including St. Joe.

106.     Transocean acted with reckless and wanting care that constituted a conscious disregard and indifference not only to the life, safety, and rights of the workers present on the *Deepwater Horizon*, but also to the Gulf, its natural resources, and all those who rely upon and benefit from them, including St. Joe.

107.     As a direct and proximate result of Transocean's gross and culpable negligence, St. Joe has sustained, and continues to suffer, substantial harm and injury.

108.     St. Joe has been damaged by the reduction in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns or manages on or near the Florida Gulf Coast, the loss of business, profits and revenue on or near the Florida Gulf Coast, the destruction of its enterprise value, and other economic losses, all as a direct result of Transocean's actions.

#13293167 v1

109.     Accordingly, St. Joe seeks to recover from Transocean monetary relief in the form of compensatory and consequential damages, plus punitive damages in an amount of at least three (3) times the amount of the actual damages awarded.

**C.     Count Three:  Strict Liability For Abnormally Dangerous Activity**

110.     St. Joe incorporates herein by reference the allegations set forth in the preceding paragraphs.

111.     Through its management and conduct of marine and drilling operations on the *Deepwater Horizon*, Transocean engaged in abnormally dangerous activities that: created a high degree of risk of harm to the person, land, and chattels of others, and particularly to St. Joe; created a likelihood that the harm resulting from such activities would be great and verging on the edge of catastrophic; created a risk of such great harm that elimination of risk by the exercise of reasonable care was impossible; were not a matter of common usage; and were inappropriate to the place carried on insofar as they constituted a non-natural use of the waters of the Gulf and in geographic proximity to Florida's fragile coast line.

112.     As a direct and proximate result of Transocean's abnormally dangerous activities, St. Joe has sustained, and continues to suffer, substantial harm and injury.

113.     The harm sustained by St. Joe is exactly the kind of harm expected, the possibility of which made Transocean's activities abnormally dangerous.

114.     St. Joe has been damaged by the reduction in value of its properties located on or near the Florida Gulf Coast, its inability to rent properties it owns and/or manages on or near the Florida Gulf Coast, the loss of business, profits and revenue on or near the Florida Gulf Coast, the destruction of its enterprise value, and other economic losses, all as a direct result of the oil spill.

115. Accordingly, St. Joe is entitled to a judgment declaring Transocean liable for all damages, including compensatory, consequential, and punitive damages, suffered as a result of Transocean's abnormally dangerous activities.

## VI.

### REQUEST FOR RELIEF

WHEREFORE Plaintiff requests that this Court enter judgment for Plaintiff and against Defendants and award Plaintiff the following relief:

    a.     actual, compensatory, consequential, and punitive damages;

    b.     reasonable attorneys' fees and costs of court;

    c.     pre-judgment and post-judgment interest at the highest lawful rates; and

    d.     such additional relief to which it may be justly entitled.

## VII.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

<table>
<tr>
<td></td>
<td><em>/s/ Edmond D. Johnson</em></td>
</tr>
<tr>
<td></td>
<td>Edmond D. Johnson (Del. Bar No. 2257)<br>James G. McMillan, III (Del. Bar No. 3979)<br>James H. S. Levine (Del. Bar No. 5355)</td>
</tr>
<tr>
<td>William A. Brewer III<br>Michael J. Collins<br>Kenneth N. Hickox, Jr.<br>BICKEL & BREWER<br>1717 Main Street<br>Suite 4800<br>Dallas, Texas 75201<br>Telephone: (214) 653-4000<br>Facsimile: (214) 653-1015</td>
<td>PEPPER HAMILTON LLP<br>Hercules Plaza, Suite 5100<br>1313 N. Market Street<br>P.O. Box 1709<br>Wilmington, DE 19899-1709<br>Telephone: (302) 777-6500<br>Facsimile: (302) 421-8390<br><em>johnsone@pepperlaw.com</em><br><em>mcmillanj@pepperlaw.com</em><br><em>levinejh@pepperlaw.com</em></td>
</tr>
<tr>
<td>Dated: October 12, 2010</td>
<td><em>Attorneys For Plaintiff<br>The St. Joe Company</em></td>
</tr>
</table>

#13293167 v1